UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JANE DOE (S.A.S.), an individual,<br><br>Plaintiff,<br><br>v.<br><br>ESA P PORTFOLIO LLC, aka Crossland<br>Tacoma/Hosmer hotel; HILTON DOMESTIC<br>OPERATING COMPANY, INC.;<br>DOUBLETREE MANAGEMENT, LLC;<br>HLT OPERATE DTWC LLC f/k/a HLT<br>OPERATE DTWC CORPORATION, aka<br>Doubletree Hotels Seattle Airport.<br><br>Defendants. | Case No. 3:23-cv-06038-TMC<br><br>ORDER DENYING MOTIONS TO<br>DISMISS |

## I.    INTRODUCTION

Plaintiff S.A.S. alleges she was a victim of sex trafficking at two hotels in the SeaTac, Washington area. In this lawsuit under the Trafficking Victims Protection Reauthorization Act, S.A.S. contends that the owner-operators of the hotels are liable to her as beneficiaries or perpetrators of sex trafficking. Before the Court are motions to dismiss from three sets of

Defendants: ESA P Portfolio LLC ("ESA"); Hilton Domestic Operating Company Inc. ("Hilton") and Doubletree Management, LLC ("Doubletree") (collectively, the "Hilton Defendants"); and ESA P Portfolio Operating Lessee LLC, ESA Management, Inc., and Extended Stay America, Inc.'s (collectively, the "New ESA Defendants"). Dkt. 58, 64, 69. Defendant HLT Operate DTWC LLC has also joined Hilton's motion and raised separate grounds for its dismissal. Dkt. 67. For the following reasons, each motion is DENIED.

## II.   BACKGROUND

Plaintiff, proceeding as Jane Doe or "S.A.S."[1], filed this lawsuit on November 13, 2023, asserting a claim under the Trafficking Victims Protection Reauthorization Act ("TVPRA"). Dkt. 1. She later amended her complaint twice, and the operative complaint raises a single claim for violation of the TVPRA's civil liability provision, 18 U.S.C. § 1595(a), which creates liability for those who violate, or benefit from violating, the statute's criminal provision.

### A.   General Trafficking Allegations

S.A.S. alleges that while she was being trafficked at Defendants' hotels, her traffickers "controlled her through physical violence and force and made her engage in commercial sex acts for their financial benefit." Dkt. 53 ¶ 20. She explains:

> Her traffickers forced her to post ads of herself and posted ads on her behalf, sometimes using her phone to do it. She did not want to engage in commercial sex acts but when she refused, they beat her. Her most abusive trafficker, D.R., told her he would murder her, her two children, and her grandparents if she tried to leave.

---

[1] S.A.S. has used pseudonyms and initials since filing this lawsuit. On June 21, 2024, the Court ordered S.A.S. to file a motion requesting leave to proceed pseudonymously. Dkt. 91; *see Doe v. Kamehameha Schs./Bernice Pauahi Bishop Est.*, 596 F.3d 1036, 1042 (9th Cir. 2010) ("The normal presumption in litigation is that parties must use their real names."); Fed. R. Civ. P. 10(a) ("The title of the complaint must name all the parties."); *DOES I Thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1067 (9th Cir. 2000) (noting that the use of "fictitious names" generally contravenes both Rule 10(a) and "the public's common law right of access to judicial proceedings" (citing *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598–99 (1978))). She has since filed such a motion, which the Court will rule on in a separate order.

He beat her at least once a week, leaving visible bruises all over her body. He did not allow her to keep any of the money she made. He also regularly forcefully injected methamphetamine into her while she was sleeping. As time went on, her traffickers became more and more controlling and abusive and eventually had her under constant surveillance.

*Id.* "S.A.S. remained under the continuous control of her traffickers through at least 2016." *Id.* ¶ 23.

## B.    Hilton Hotel Allegations

S.A.S. alleges that she was "repeatedly trafficked for sex" at the Doubletree Hotels Seattle Airport "[f]or a period of time that included," but was not limited to, "approximately November 29, 2013 to November 30, 3013."[2] Dkt. 53 ¶ 92.

S.A.S. recounts various features of her trafficker's conduct with her at the hotel that were consistent with trafficking activity. S.A.S. "would constantly be guarded or escorted by her trafficker or one of his associates who would be assigned to sit outside her room." *Id.* ¶ 93. When she checked in, she would be "wearing provocative clothing that was inappropriate for the weather." *Id.* The trafficker did not allow her to bring her personal possessions into the hotel "because of concern she would attempt to run." *Id.*

S.A.S. describes her trafficker's behavior as "open": he would "linger" around "common areas of the hotel" like the lobby or parking lot while S.A.S. was "seeing johns," *id.* ¶ 93, use the "publicly viewable computer in the hotel business center to post ads to recruit customers to exploit S.A.S.," and force S.A.S. to "pick up tricks at the hotel, in plain view of hotel staff." *Id.* ¶¶ 93–94. He maintained "a relationship with hotel staff, including management staff." *Id.* ¶ 94. One manager allegedly was a "customer" himself, "exchanging free rooms for [S.A.S.'s]

---

[2] S.A.S. explains that she cannot remember the additional dates she was trafficked at the Doubletree but that, "[u]pon information and belief, Defendants' records will reveal additional dates that S.A.S. was at this hotel." Dkt. 53 ¶ 92.

services." *Id.* The behavior of the "customers" themselves was also telling: they would arrive at and leave the hotel at "unusual hours," only staying "for brief periods of time;" there was "heavy foot traffic in and out of S.A.S.'s room" and the men "would gather outside" of it. *Id.* ¶ 93. "Loud noises and yelling could be heard by guests." *Id.*

Moreover, S.A.S. alleges the traffickers' selection of the Doubletree was intentional. *See id.* ¶ 102 (noting that the traffickers did not have "to expend significant efforts to avoid detection or interference" at the Doubletree). At the Doubletree, "access was easy, risks of interference were low, and traceability was minimal." *Id.* ¶ 114. The trafficker "frequently paid cash and other anonymous forms of payment for the hotel rooms in which S.A.S. was trafficked," *id.* ¶ 92, which "provided relative anonymity and non-traceability." *See id.* ¶ 114.

S.A.S. alleges she was not the only victim who was trafficked at the Doubletree. "Upon information and belief," she alleges that, prior to her trafficking, "hotel staff and management" observed rooms being paid with "cash or prepaid cards," "high volumes of men who were not registered guests in and out of their room at unusual times, [and alleged victims] arriving with few possessions for extended stays." *Id.* ¶ 87.

Doubletree continued to rent rooms to S.A.S.'s traffickers even after these signs of trafficking occurred, and as its staff maintained its relationship with S.A.S.'s trafficker. *See id.* ¶ 101. "Based on the . . . [alleged] red flags of S.A.S.'s trafficking, hotel staff and Franchisee were required to make a report to Hilton and, upon [S.A.S.'s] information and belief, did so." *Id.* ¶ 97.

## C.    ESA Hotel Allegations

S.A.S.'s trafficker also "repeatedly" trafficked her at the CrossLand Tacoma/Hosmer Hotel (the "Crossland") for a period of time that included, but was not limited to, November 16, 2013 to November 20, 2013. Dkt. 53 ¶ 45. S.A.S. alleges the Crossland was owned and operated by the ESA Defendants. *Id.* ¶¶ 9–14.

ESA rented rooms to S.A.S.'s trafficker, *id.* ¶ 67, which were "frequently paid for with cash," *id.* ¶ 47. S.A.S. describes how her trafficker coerced and controlled her as follows:

> S.A.S.'s trafficker physically assaulted her while she was in her room at the Crossland Tacoma/Hosmer. This resulted in bruising to S.A.S.'s face and body. S.A.S. screamed during this assault. At the time of this assault, housekeeping staff was in the vicinity cleaning rooms. Immediately before the assault, housekeeping had attempted to enter S.A.S.'s room for cleaning and had been refused entry. Upon information and belief, housekeeping staff and other guests heard S.A.S.'s screams.

*Id.* ¶ 46.

Much like at the Hilton, S.A.S. would be "wearing provocative clothing that was inappropriate for the weather" and her trafficker did not allow her to bring personal possessions into the hotel. *Id.* ¶ 48. And, according to the complaint, other signs of trafficking were observed by hotel staff: S.A.S. had "visible bruising on her face and body when interacting with hotel staff" and "[h]ousekeeping was not permitted to enter S.A.S.'s room," but S.A.S. would be forced to meet them at the door "to take clean towels and washcloths[] and to provide them with a garbage bag." *Id.*

Also like her experience at Hilton, the behavior of the traffickers and the "customers" may have alerted hotel staff that S.A.S. was being trafficked. "S.A.S. was largely confined to her room and would constantly be guarded or escorted by her trafficker or one of his associates who would be assigned to sit outside her room. Her trafficker and his associates would linger in common areas of the hotel, such as in the stairwell or in the parking lot while S.A.S. was seeing johns." *Id.* "To reserve S.A.S.'s room for additional nights, johns, who were men of different ages and races, would bring cash to the front desk and claim to be S.A.S.'s 'uncles.'" *Id.* They would "gather outside S.A.S.'s room" and [l]oud noises and yelling could be heard by guests." *Id.* "There was heavy foot traffic in and out of S.A.S.'s room by men who were not hotel guests, entered and left at unusual hours, and were present at the hotel for brief periods of time." *Id.*

ORDER DENYING MOTIONS TO DISMISS - 5

According to the complaint, S.A.S.'s traffickers were not the only traffickers that used the Crossland; the hotel "was located in an area known for criminal activity associated with sex trafficking . . . . A population of traffickers and drug dealers rotated between hotels in this area, including the Crossland . . . ." Dkt. 53 ¶ 39. Others had been trafficked at the Crossland before S.A.S., and "hotel staff and management" observed them "paying with cash or prepaid cards, having high volumes of men who [were] not registered guests in and out of their rooms at unusual times, [and] arriving with few possessions for extended stays." *Id.* ¶ 41. "Hotel staff provided extra washcloths so customers could clean up." *Id.* ¶ 48. Like Hilton, ESA "required hotel staff to report suspected trafficking activity to ESA." *Id.* ¶ 43.

## III.    DISCUSSION

**A.    Legal Standards**

*1.    Motion to Dismiss*

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Under Federal Rule of Civil Procedure 12(b)(6), the Court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Rule 12(b)(6) motions may be based on either the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (citation omitted).

To survive a Rule 12(b)(6) motion, the complaint "does not need detailed factual allegations," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), but "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Boquist v. Courtney*, 32 F.4th 764, 773 (9th Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotation marks omitted).

The Court "must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the nonmoving party." *Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014). But the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

"In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).

### 2.    TVPRA

"In 2000, Congress enacted the [Trafficking Victims Protection Act] to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims." *Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159, 1164 (9th Cir. 2022) (internal quotation marks omitted). Congress "reauthorized and amended" the statute in 2003 and added a civil remedy provision, which provided for civil liability for those who perpetrated or participated in an underlying violation the statute's criminal provisions. *See* Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193, § 4(a)(4)(A), 117 Stat. 2875

(2003). Congress again reauthorized and amended the TVPRA in 2008 "to expand the civil

remedies provision." *Ratha*, 35 F.4th at 1164. Under that provision:

> An individual who is a victim of a violation of this chapter may bring a civil action
> against the perpetrator (or whoever knowingly benefits, or attempts or conspires to
> benefit, financially or by receiving anything of value from participation in a venture
> which that person knew or should have known has engaged in an act in violation of
> this chapter) in an appropriate district court of the United States and may recover
> damages and reasonable attorneys fees.

18 U.S.C. § 1595. Relevant here, the TVPRA sets out criminal liability for:

> (a) Whoever knowingly--
>     (1) in or affecting interstate or foreign commerce, or within the special
> maritime and territorial jurisdiction of the United States, recruits, entices, harbors,
> transports, provides, obtains, advertises, maintains, patronizes, or solicits by any
> means a person; or
>     (2) benefits, financially or by receiving anything of value, from
> participation in a venture which has engaged in an act described in violation of
> paragraph (1),
>
> knowing, or, except where the act constituting the violation of paragraph (1) is
> advertising, in reckless disregard of the fact, that means of force, threats of force,
> fraud, coercion described in subsection (e)(2), or any combination of such means
> will be used to cause the person to engage in a commercial sex act, or that the person
> has not attained the age of 18 years and will be caused to engage in a commercial
> sex act, shall be punished as provided in subsection (b).

18 U.S.C. § 1591. The civil provision of the statute thus creates liability for both those who

perpetrate trafficking themselves ("perpetrator liability") and those who "knowingly benefit[],

financially or by receiving anything of value from participation in a venture which that person

knew or should have known has engaged in an act in violation of" the TVPRA ("beneficiary

liability"). 18 U.S.C. § 1595(a). S.A.S. alleges that all defendants are liable as both perpetrators

and beneficiaries of her trafficking. The Court analyzes each theory for each defendant in turn.

**B.    Analysis**

   *1.    Hilton Defendants*

        *a.   S.A.S. is a "Proper Plaintiff" because she was a "victim" of Sex Trafficking.*

Hilton begins its motion by arguing that S.A.S. has not sufficiently alleged that she was "a victim of a violation of" the TVPRA's criminal provision. *See* Dkt. 64 at 12 ("To invoke the TVPRA, a plaintiff must plausibly allege that that she was 'a victim of a violation of this chapter.'" (quoting 18 U.S.C. § 1595(a))). S.A.S. does not dispute that a plaintiff must show she was a "victim" of trafficking to prove civil liability, and the requirement is supported by the plain language of the statute, which describes those who "may bring a civil action" as those who are "victim[s] of a violation of this chapter." *See* 18 U.S.C. § 1595(a). Other courts have interpreted the "victimhood" requirement the same way. *See G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 551–53 (7th Cir. 2023) (treating the "victimhood" requirement as pertaining to whether the plaintiff "is a proper plaintiff under Section 1595," and noting that the remaining elements concern "whether [the defendant] is a proper defendant"); *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 964 (noting that "[t]he plain text of § 1595(a) requires []that the plaintiff be 'a victim of this chapter'" and analyzing this requirement before reaching the statute's defendant-specific elements (quoting § 1595(a))).

"A 'victim' is defined in the TVPRA as 'the individual harmed as a result of a crime under this chapter[.]'" *Doe K.R. v. Choice Hotels*, No. 6:23-cv-1012-JSS-LHP, 2024 U.S. Dist. LEXIS 104200, at *6 (M.D. Fla. June 12, 2024) (quoting 18 U.S.C. § 1593(c)). A plaintiff plausibly alleges they were a "victim" of trafficking if their allegations show a defendant "*could be* criminally liable." *G.G.*, 76 F.4th at 552 (emphasis added). In relevant part, section 1591 provides that a party is criminally liable for trafficking if it "recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means"—or benefits by providing knowing assistance, support, or facilitation to a venture that does so—"knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection

(e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act." 18 U.S.C. § 1591(a); § 1591(e)(4).

S.A.S. alleges that she "did not want to" to participate in her traffickers' commercial sex operation, but "when she refused they beat her." Dkt. 53 ¶ 20. When she would try to "leave," one trafficker would threaten to murder her, her children, and her grandparents. *See id.* And her trafficker or one of his associates constantly "guarded" or "escorted" her while she was being trafficked at the Hilton. *Id.* ¶ 93. These allegations are more than sufficient to show that S.A.S.'s trafficking plausibly violated the TVPRA's criminal provision. *See Doe K.R.*, 2024 U.S. Dist. LEXIS 104200, at *6–7 (finding that the plaintiff sufficiently alleged she was a "'victim' under the statute where she asserted that 'she was "drugged and forced into human trafficking" and "[u]nder the constant threat of terror . . . [was] forced and kept . . . in the bondage of human trafficking by [her trafficker's] drugging her, physically assaulting her, deviously professing his love for her, and by not allowing her to go anywhere without him."'). Hilton's motion on this ground is denied.[3]

---

[3] Hilton argues that S.A.S. has not sufficiently alleged she was a victim of trafficking because she does not show "a nexus between any TVPRA violation and the Doubletree Seattle Airport," that S.A.S. was "harbored" or "maintained" *at* the Doubletree, or that she was caused to participate in commercial sex activity through "force, fraud, or coercion" *at* the Doubletree. *See* Dkt. 64 at 12–14. Hilton appears to raise these arguments as to both S.A.S.'s perpetrator and beneficiary liability theories. *See id.* (treating the "victimhood" requirement as a predicate issue before separately addressing whether S.A.S. has sufficiently alleged beneficiary or perpetrator theories). Hilton's arguments that "force, fraud, or coercion" must have occurred *at* the Doubletree are unavailing, especially as to her beneficiary liability theory, since the criminal statute does not require that the "perpetrator" themselves used force, fraud, or coercion. *See* § 1591(a) (providing liability for those who harbor or maintain, or knowingly assist in doing so, "knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means *will be used* to cause the person to engage in a commercial sex act." (emphasis added)). S.A.S. is not suing her trafficker, but the hotel that allegedly knew or should have known it was participating in her trafficking. The remainder of Hilton's arguments regarding "nexus" and where she was harbored or maintained are better addressed in discussing the defendant-specific elements below.

*b.   Beneficiary Liability*

To succeed on a beneficiary liability theory under § 1595(a), the plaintiff must show that the defendant "(1) knowingly benefitted, (2) from participation in a venture . . . , (3) which they knew or should have known was engaged in conduct that violated the TVPRA." *Ratha*, 35 F.4th at 1175 (citing 18 U.S.C. § 1595(a)).[4] Showing each element is required. *See id.* The Court considers each element in turn.

*i.   Participation in a Venture*

As the D.C. Circuit recently acknowledged, courts have recognized multiple ways to establish the "participation in a venture" requirement. Some have held that a plaintiff sufficiently pled facts from which a court could infer "a common purpose, shared profits and risk, or control," *see Doe 1 v. Apple Inc.*, 96 F.4th 403, 416 (D.C. Cir. 2024) (citing *Ricchio v. McLean*, 853 F.3d 553, 555 (1st Cir. 2017)), while others have accepted showings of a "direct and continuous relationship that existed between the parties," *id.* (citing *G.G.*, 76 F.4th at 560); *see also M.A.*, 425 F. Supp. 3d at 970 ("In the absence of a direct association, Plaintiff must allege at least a showing of a continuous business relationship between the trafficker and the hotels such that it would appear that the trafficker and the hotels have established a pattern of conduct or could be said to have a tacit agreement.").

Where a defendant "provides assistance, support, or facilitation to the trafficker through such a 'continuous business relationship,' a court or jury may infer that the participant and

---

[4] In *G.G. v. Salesforce.com, Inc.*, the Seventh Circuit "reorganized the most common summaries of these elements to follow a logical sequence rather than the sequence of the phrases in Section 1595": "a plaintiff . . . who is a victim of a criminal violation must allege and ultimately prove that (1) a venture has engaged in an act in violation of Section 1591, (2) the defendant knew or should have known that the venture had violated Section 1591, (3) the defendant participated in that venture, and (4) the defendant knowingly benefited from its participation." 76 F.4th 544, 553 n.5 (7th Cir. 2023).

trafficker have a 'tacit agreement' that is sufficient for 'participation' under Section 1595." *G.G.*, 76 F.4th at 559 (quoting *M.A.*, 425 F. Supp. 3d at 970–71); *Doe v. Mindgeek USA Inc.*, 558 F. Supp. 3d 828, 837 (C.D. Cal. 2021) (quoting *M.A.*, 425 F. Supp. 3d at 970). Notably, "a participant defendant need not have committed 'some "overt act" that furthers the sex trafficking aspect of the venture' or have 'associated' with the sex trafficker 'for the purpose of furthering the sex trafficking.'" *G.G.*, 76 F.4th at 559 n.15 (quoting *M.A.*, 425 F. Supp. 3d at 968–69 and noting that "[t]he vast majority of district courts agree" with this proposition); *J.C. v. Choice Hotels Int'l, Inc. ("J.C. II")*, No. 20-cv-00155-WHO, 2020 WL 6318707, at *7 (N.D. Cal. Oct. 28, 2020) (collecting district court decisions in the Ninth Circuit with the same conclusion).

District courts in the Ninth Circuit relying on the *M.A.* standard[5] have found that plaintiffs satisfied the "participation" requirement under similar facts as those alleged in this case. In *J.C. II*, the Northern District of California held that the plaintiff "plausibly connected the dots" between the defendant hotel and a sex trafficking venture that allegedly rented and used rooms for trafficking by alleging that the defendants "providing lodging to people it knew or should have known were engaged in *her* sex trafficking" and that the hotels had "purported policies that . . . staff who observe 'obvious signs', like the ones J.C. exhibited, report such incidents up the chain to the corporate defendants named in this suit." 2020 WL 6318707, at *7 (emphasis in original).[6] S.A.S. alleges Hilton had a similar policy. *Id.* ¶ 97 ("Based on the obvious red flags of S.A.S.'s trafficking, hotel staff and Franchisee were required to make a

---

[5] Despite its recognized persuasiveness for TVPRA beneficiary liability claims, including by many district court decisions in the Ninth Circuit, and S.A.S.'s reliance on it in her response, Hilton's briefing never mentions *M.A.* or explains why the Court should not follow it.

[6] Like Hilton Defendants, the hotel defendants in *J.C. II* were franchisors, not franchisees. *See* 2020 WL 6318707, at *5; Dkt. 53 ¶ 81 (describing Hilton Defendants as "controll[ing] Doubletree Franchisee Defendants and Doubletree-branded properties, including the Doubletree Hotels Seattle Airport.").

report to Hilton and, upon [S.A.S.'s] information and belief, did so."). And, according to S.A.S., hotel staff observed numerous signs of trafficking, maintained a relationship with the trafficker, and even (in the case of one manager) became one of S.A.S.'s customers. *See I.R. v. I Shri Khodiyar, LLC*, No. 1:22-CV-00844-SEG, 2024 WL 1928755, at *7 (N.D. Ga. Mar. 18, 2024) (treating a "managerial employee's" "solicit[ation]" of the plaintiff "for sex at the hotel and providing free lodging in exchange" as evidence of the hotel's participation in a sex trafficking venture).

Moreover, that S.A.S was "repeatedly trafficked" at the Doubletree, which provided a service to her trafficker that was tailored to his needs, is sufficient to show a continuous business relationship where the Doubletree provided "assistance, support, or facilitation" that went beyond mere "arms-length transactions." *See* Dkt. 53 ¶ 102 (noting that the traffickers did not have "to expend significant efforts to avoid detection or interference" at the Doubletree); *id.* ¶ 114 (noting that at Hilton, "access was easy, risks of interference were low, and traceability was minimal."); *id.* ¶¶ 92, 114 (the trafficker "frequently paid cash and other anonymous forms of payment for the hotel rooms in which S.A.S. was trafficked," which "provided relative anonymity and non-traceability."); *G.G.*, 76 F.4th at 560 ("To survive a motion to dismiss, all that is necessary is for a plaintiff to allege such a 'continuous business relationship,' which gives rise to an inference, drawn in the plaintiff's favor, that the civil defendant facilitated the venture's success."); *see also id.* at 559 (favorably citing *M.A.* and mentioning "providing hotel rooms" as a general example of "direct involvement" that could satisfy the "participation element"). Courts have held that similar allegations were sufficient to plead participation in a venture. *See, e.g.*, *Doe (L.M.) v. 42 Hotel Raleigh, LLC*, No. 5:23-CV-235- FL, ECF No. 48, (E.D.N.C. June 11, 2024) (finding that allegations of renting rooms to sex traffickers that the hotel should have known were engaged in trafficking was sufficient, under the *M.A.* standard, to

show "participation in a venture," and distinguishing *Doe 1*, where the D.C. Circuit relied on the defendant businesses' lack of market power to control third party traffickers' actions). S.A.S. has sufficiently alleged Hilton's participation in her traffickers' venture.[7]

### ii.  *Actual or Constructive Knowledge*

To satisfy the statute's knowledge element, S.A.S. must show that Hilton either had "actual knowledge of her sex trafficking" or, "at the very least, rented rooms to people [it] should have known were engaging in her sex trafficking." *See J.C. II*, 2020 WL 6318707, at *4. Hilton argues that S.A.S. must allege knowledge of trafficking specifically as to her and that, based on the complaint, "the most hotel staff might have speculated about Plaintiff is that she was there (on the one night identified) to engage in prostitution." *See* Dkt. 64 at 18.

S.A.S. alleges that while at the hotel she "would constantly be guarded or escorted by her trafficker or one of his associates who would be assigned to sit outside her room." Dkt. 53 ¶ 93. When she checked in, she would be "wearing provocative clothing that was inappropriate for the weather." *Id.* The trafficker did not allow her to bring her personal possessions into the hotel "because of concern she would attempt to run." *Id.* Moreover, her trafficker would "linger" around "common areas of the hotel" like the lobby or parking lot while S.A.S. was "seeing johns," *id.* ¶ 93, and would use the "publicly viewable computer in the hotel business center to

---

[7] Hilton's argument that the Court should discount S.A.S.'s allegation of the Doubletree manager exchanging free rooms for sex in considering the "participation" element is misplaced. Hilton argues, citing agency principles, that the manager's sexual acts and "embezzlement" (giving away rooms) were not within the scope of his employment and therefore cannot be imputed to Hilton. Dkt. 64 at 19–20. As explained, however, a plaintiff can show participation by showing facilitation, assistance, or support for the trafficking venture as part of a continuous business relationship. And in the hotel context, courts generally find sufficient that a defendant rented rooms to traffickers when it "knew or should have known" they were trafficking the plaintiff. It is not that the manager's conduct is itself imputed as "participation" by Hilton in the trafficking venture, but rather that his conduct shows Hilton knew or should have known about S.A.S.'s trafficking at the hotel, particularly given its alleged reporting policy.

post ads to recruit customers to exploit S.A.S." He also forced S.A.S. to "pick up tricks at the hotel, in plain view of hotel staff." *Id.* ¶¶ 93–94. He maintained "a relationship with hotel staff, including management staff." *Id.* ¶ 94. And one manager even "exchang[ed] free rooms for [S.A.S.'s] services." *Id.*

Customers would arrive at and leave the hotel at "unusual hours," only staying "for brief periods of time;" there was "heavy foot traffic in and out of S.A.S.'s room" and the men "would gather outside" of it. *Id.* "Loud noises and yelling could be heard by guests." *Id.* S.A.S. alleges "multiple" hotel employees (including managers) "observed and/or were made aware of" these alleged signs of trafficking. *See id.* ¶ 96.

Courts have recognized similar allegations of "red flags" to support a showing that the defendant hotel had at least constructive knowledge of trafficking. *See J.C. II*, 2020 WL 6318707, at *5 (holding that the plaintiff "sufficiently allege[d] details" of "apparent red flags" that she and her traffickers exhibited at the defendant hotels, including "traffickers checking J.C. in and then not proceeding to the room; paying for the room in cash and paying in smaller increments; [and] a steady stream of men, who were not registered hotel guests, entering and exiting J.C.'s room." (cleaned up)).

Moreover, construing the complaint in S.A.S.'s favor, the control that S.A.S.'s traffickers allegedly showed over her while at the hotel ("constantly" being guarded or escorted by her trafficker or his associates, including sitting outside her room) further supports that hotel staff were on reasonable notice that S.A.S. was being "harbored" or "maintained" in the rooms she was staying and was being "coerced" into commercial sex. *See* § 1595(a); § 1591(e)(2) (defining "coercion" in the statute's criminal provision, in part, as "threats of serious harm to *or physical restraint* against any person" or "any scheme, plan, or pattern *intended to cause a person to believe* that failure to perform an act would result in serious harm to *or physical restraint* against

any person") (emphasis added)); *cf. A.B. v. Extended Stay America*, No. 3:22-cv-05939-DGE, 2023 WL 5951390, at *6 (W.D. Wash. Sept. 13, 2023) (emphasizing, in finding that the plaintiff's allegations were insufficient to show constructive knowledge of sex trafficking, that "Plaintiff did not check in to the hotel with her trafficker. She was given a hotel key outside in her trafficker's car and would then walk *by herself* through the lobby as an unregistered guest and into the room without making eye contact." (emphasis added) (internal quotation marks omitted)). S.A.S. also alleges these signs were enough for "hotel staff and [the Doubletree]" to make a report to Hilton about the "red flags" of her trafficking they observed. *See* Dkt. 53 ¶ 97.

Taken together—along with her allegations of yelling emanating from her room, frequent guests coming in and out of her room, use of cash to pay for her rooms, and being forced to meet customers in view of hotel staff—these allegations are sufficient to show that Hilton knew or should have known S.A.S. was being trafficked. *See S.Y. v. Naples Hotel Co.*, 476 F. Supp. 3d 1251, 1257 (M.D. Fla. 2020) (finding allegations that sex traffickers made cash payments for rooms, that hotel staff observed plaintiffs and their traffickers in the hotel and the plaintiffs were "escorted" by the traffickers, and that there were "[p]leas and screams [for] help coming from the rooms of [the plaintiffs]" and "[m]ultiple men per day coming and going from the same rooms," among others, were sufficient to plead constructive knowledge).[8]

---

[8] Hilton's argument that the Court can plausibly infer only that its staff suspected prostitution is unavailing. In making this argument, Hilton only cites a definition of "force," suggesting that S.A.S. must allege constructive knowledge "that she was being subjected to 'violence or such threat or display of physical aggression toward a person as reasonably inspires fear of pain, bodily harm, or death.'" Dkt. 64 at 13 (quoting *United States v. Love*, 743 F. App'x 138, 139 (9th Cir. 2018), which itself quoted the definition of "force" in *Webster's Third New International Dictionary*, 887, 904 (2002)). However, the statute creates criminal liability for being caused to engage in a commercial sex act through coercion as well. *See* § 1591(a). Hilton does not explain why S.A.S.'s allegations—especially the signs of her traffickers' control over her, viewed collectively and in the light most favorable to her, do not plausibly establish constructive knowledge of "coercion."

### iii.  Knowingly Benefit

Hilton does not dispute the "knowingly benefit" element aside from arguing that S.A.S.'s

purported failure to establish the other elements implies her failure to establish this element. *See*

Dkt. 64 at 15 n.6. S.A.S. alleges that:

> Defendants' venture with traffickers resulted in revenue from room rentals and
> other incidental purchases by traffickers, including S.A.S..'s trafficker, which
> accrued to the benefit of both Hilton and the Doubletree Franchisee Defendants.
> Each room rented at the Doubletree Hotels Seattle Airport increased revenue for
> both Hilton and the Doubletree Franchisee Defendants.

Dkt. 53 ¶ 126. The Court agrees with others that have found "that the rental of a room constitutes

a financial benefit from a relationship with the trafficker sufficient to meet this element of the

§ 1595(a) standard." *M.A.*, 425 F. Supp. 3d at 965. S.A.S. satisfies this element of the test.

Having found that S.A.S. has sufficiently alleged each element of the statute, the Court

DENIES Hilton's motion to dismiss.

### c.  Perpetrator Liability

Hilton also moves to dismiss S.A.S.'s perpetrator liability theory.[9] "Civil perpetrator

liability under § 1595 adopts § [1591]'s elements for criminal liability." *B.J. v. G6 Hosp., LLC*,

---

[9] Because S.A.S. pleads both beneficiary and perpetrator liability as part of her single count for a
violation of section 1595, the claim survives so long as one theory is adequately pled. Fed. R.
Civ. P. 8(d)(2) ("A party may set out two or more statements of a claim or defense alternatively
or hypothetically, either in a single count or defense or in separate ones. *If a party makes
alternative statements, the pleading is sufficient if any one of them is sufficient*." (emphasis
added)); *Brown v. Rawson-Neal Psychiatric Hosp.*, 840 F.3d 1146, 1152 (9th Cir. 2016) (Graber,
J., dissenting) ("If even one theory supporting a claim for relief is plausible, the claim cannot be
dismissed under Rule 12(b)(6)" (citing, inter alia, Fed. R. Civ. P. 8(d)(2)); *see also Pac. Coast
Fed'n of Fishermen's Ass'ns v. Glaser*, 945 F.3d 1076, 1086 (9th Cir. 2019) ("A party need not
plead specific legal theories in the complaint, so long as the other side receives notice as to what
is at issue in the case."). The Court will still consider, however, whether the perpetrator liability
theory is sufficiently alleged. *See Staley v. Gilead Scis., Inc.*, 2020 U.S. Dist. LEXIS 167071, at
*43 (N.D. Cal. July 24, 2020) ("Often, a plaintiff asserts a single cause of action that is
predicated on more than one liability theory, and a court eliminates one theory through a motion
to dismiss.").

No. 22-cv-03765-MMC, 2023 WL 6120682, at *11 (N.D. Cal. Sept. 18, 2023) (internal quotation marks omitted). "To prove a criminal violation of Section 1591, the government must prove that the defendant, with the requisite state of mind, either (1) engaged in one of the listed acts of sex trafficking or (2) benefitted from participating in a venture that engaged in one of those acts." *G.G.*, 76 F.4th at 552. To prove beneficiary liability under the *criminal* provision, § 1591(a)(2), the perpetrator must have "knowingly assist[ed], support[ed], or facilitat[ed]" whoever "recruit[ed] . . . , harbor[ed], or maintain[ed]" the victim. § 1591(e)(4).

As for the criminal provision's knowledge requirement, "[w]hat the statute requires is that the defendant kn[ew] in the sense of being aware of an established modus operandi that will in the future cause a person to engage in prostitution." *J.M. v. Choice Hotels Int'l, Inc.*, No. 2:22-cv-00672-KJM-JDP, 2023 WL 3456619, at *2 (E.D. Cal. May 15, 2023) (quoting *Noble v. Weinstein*, 335 F. Supp. 3d 504, 517–28 (S.D.N.Y. 2018)).

Construing the complaint in her favor, S.A.S.'s allegations described above are sufficient to meet the criminal provision's knowledge requirement and show that Hilton at least facilitated or assisted the trafficking operation. *See J.M.*, 2023 WL 3456619, at *2–3 (finding similar allegations of observed red flags, which were reported to the defendant hotel, to be sufficient to plead a perpetrator liability claim).

### 2.    HLT Operate

HLT Operate joins and "adopts in full" Hilton's motion to dismiss and argues separately that dismissal is warranted because Plaintiff "alleges nothing against HLT in particular, instead improperly group-pleading it with Doubletree Management LLC." Dkt. 67 at 2. It also argues that the Court should ignore S.A.S.'s allegation that it owned *and operated* the Doubletree Hotel Seattle Airport, Dkt. 53 ¶ 19, because a declaration she filed in support of her motion for leave to amend refers to a declaration of a "a Hilton Worldwide, Inc. officer" that only described HLT as

the "owner," but not the "operator," of the Doubletree. Dkt. 67 at 2 (quoting Dkt. 42 ¶ 3).[10]

S.A.S.'s declaration states: "The proposed Second Amended Complaint is based *in part* on

Plaintiff counsels' reliance on the representations made by Mr. Wilcox in his declaration and

other counsel and agents of the Hilton defendants. We rely on their assurances that their

representations are true and accurate." Dkt. 42 ¶ 3 (emphasis added). And HLT's reply in support

of its joinder argues for the first time that crediting the truth of the declaration over the second

amended complaint is appropriate under the incorporation by reference doctrine. Dkt. 79 at 2 n.2

(citing *Harris v. Amgen*, 738 F.3d 1026, 1035 (9th Cir. 2013)).

"A court may . . . consider certain materials—documents attached to the complaint,

documents incorporated by reference in the complaint, or matters of judicial notice—without

converting the motion to dismiss into a motion for summary judgment." *U.S. v. Ritchie*, 342 F.3d

903, 908 (9th Cir. 2003). Under the "incorporation by reference" exception, "[e]ven if a

document is not attached to a complaint, it may be incorporated by reference into a complaint if

the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's

claim." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018). A document

"forms the basis of the plaintiff's claim" if: "(1) the complaint refers to the document; (2) the

document is central to the plaintiff's claim; *and* (3) no party questions the authenticity of the

copy attached to the 12(b)(6) motion." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006)

(emphasis added). The second amended complaint does not refer to the declaration that HLT

argues contradicts the allegation of its operation of the Doubletree, and the document is not

"central" to S.A.S.'s TVPRA claim. And the declaration only says that the second amended

complaint is based "in part" on the representations of the Hilton officer's declaration.  Dkt. 42 ¶

---

[10] S.A.S. did not respond to HLT's separate argument in her response to Hilton's motion but did so during oral argument.

1   3. The Court will not treat this document as incorporated by reference into the second amended

2   complaint and will assume, as it must, that the complaint's allegations are true.

3   S.A.S. alleges that, while Hilton was the franchisor, HLT Operate and Doubletree

4   Management, LLC "owned and operated the Doubletree Hotels Seattle Airport." Dkt. 53 ¶ 19;

5   *see also id.* ¶ 81 ("Hilton, acting directly and through affiliates, adopted centralized policies that

6   controlled Doubletree Franchisee Defendants and Doubletree-branded properties, including the

7   Doubletree Hotels Seattle Airport."). S.A.S.'s allegations are sufficient to show TVPRA liability

8   considering the conduct of HLT's hotel staff discussed above. *See B.J. v. G6 Hosp., LLC*, No.

9   22-cv-03765-MMC, 2023 WL 6120682, at *6–7 (N.D. Cal. Sept. 18, 2023) (treating knowledge

10  or constructive knowledge of hotel staff as being the knowledge or constructive knowledge of

11  the franchisee).

12  The Court also rejects HLT's argument that the complaint is deficient because it

13  impermissibly engages in "group pleading." This rule applies when "lumping together of

14  multiple defendants in one broad allegation" leads to "confusion of which claims apply to which

15  defendants." *Sechrist v. Rev Recreation Grp., Inc.*, 2023 WL 8351517, at *2 (C.D. Cal. Oct. 23,

16  2023) (first quoting *Gen-Probe, Inc. v. Amoco Corp.*, 926 F. Supp. 948, 961 (S.D. Cal. 1996);

17  then quoting *Gauvin v. Trombatore*, 682 F. Supp. 1067, 1071 (N.D. Cal. 1988)). Consequently,

18  "[t]he fact that multiple Defendants often are alleged to be liable for a given violation is not

19  necessarily an issue, as long as each Defendant is on notice of the claims against it." *Ji v. Naver*

20  *Corp.*, No. 21-cv-05143-HSG, 2023 WL 6466211, at *4 (N.D. Cal. Oct. 3, 2023).

21  The "group" in question here is HLT Operate and Doubletree Management, LLC, both of

22  whom S.A.S alleges "owned and operated the Doubletree Hotels Seattle Airport." Dkt. 53 ¶ 19.

23  HLT does not argue and there is no suggestion that this group pleading has caused confusion as

24

to which allegations pertain to which defendant. HLT's request to dismiss the claim against it is denied.

### 3. *ESA P Portfolio LLC*

#### i. *Victimhood and Actual or Constructive Knowledge*

ESA first argues that S.A.S. does not sufficiently allege its actual or constructive knowledge of her trafficking. ESA's arguments rely on its contention that S.A.S. impliedly concedes she was not "trafficked," as defined in the statute, in portions of her complaint that appear to anticipate a statute of limitations defense:

> At the time Plaintiff was harmed, Plaintiff did not know that she was the victim of human trafficking, that her injury arose from being trafficked at Defendants' hotels or that she was a person trafficked, much less that she was being victimized by a human trafficking venture, and she did not discover and was not in a position to discover *the legal cause of her injury*, and certainly not more than ten years before suit was filed. Moreover, at the time the trafficking occurred, Plaintiff did not know what "human trafficking" was, much less that she was being victimized by a human trafficking venture, and she did not discover and was not in a position to discover the existence of a cause of action until shortly before suit was filed, and certainly not more than ten years before suit was filed.

Dkt. 53 ¶ 148 (emphasis added). ESA argues these statements "can only mean one thing – at the time it occurred, Plaintiff engaged in commercial sex willingly," Dkt. 58 at 5, and as to the knowledge element, "Defendant could not have known that Plaintiff was being trafficked if Plaintiff herself was unaware of it." Dkt. 58 at 6.

Both arguments ask the Court to draw an unnecessary inference in ESA's favor: that S.A.S.'s statement that she did not know she was "the victim of human trafficking" and had not "discover[ed] the legal cause of her injury" necessarily means she wasn't caused to participate in commercial sex through "means of force, threats of force, fraud, [or] coercion." § 1591(a). To the contrary, the Court must construe the complaint in the light most favorable to the plaintiff and draw reasonable inferences in her favor. *Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007);

*Retail Prop. Tr*, 768 F.3d at 945. The cited portion of the complaint[11] does not specifically discuss "force, fraud, or coercion," and the Court can reasonably infer it is merely saying S.A.S. was not aware she had a *legal cause of action* until shortly before filing this lawsuit. And even if the Court drew the inference in favor of ESA, ESA cites no authority for the proposition that a victim must be *subjectively* aware that they are being caused to participate in commercial sex through force, fraud, or coercion in order to be "trafficked." Indeed, that interpretation could prevent some of the most vulnerable potential victims—such as children, or those incapacitated by mental illness or drugs—from establishing the victimhood element. ESA also cites no authority for the argument that evidence of the victim's own mindset is relevant to the *defendant's* knowledge or constructive knowledge of her alleged trafficking. These grounds for ESA's motion are denied.

> ii.   *ESA's alleged relationship with S.A.S.'s trafficker is sufficient to show "participation."*

ESA also argues, as to the "participation in a venture" element, that:

> Plaintiff does not, however, make any contention that her trafficker had any dealings with Defendant . . . . Because Plaintiff's SAC is devoid of any allegations establishing that ESA participated in a sex trafficking venture with her trafficker, Plaintiff's TVPRA claim fails to sufficiently plead a claim under the TVPRA and her SAC must be dismissed.

Dkt. 58 at 8. The premise of ESA's argument—that there are no allegations it had a relationship with S.A.S.'s trafficker—is incorrect. The complaint specifically alleges that "Defendant ESA rented rooms at the Crossland to Plaintiff's trafficker." Dkt. 53 ¶ 67.

Along with this allegation, the complaint also asserts that S.A.S. was "repeatedly" trafficked at the Crossland; that her trafficker physically assaulted her in a room, causing her to

---

[11] This portion of the complaint is in a section titled "Discovery Rule," which is separate from the "Facts" and "Cause of Action" sections.

scream loudly enough that housekeeping staff nearby could hear it; that S.A.S. had visible bruising on her face and body when interacting with hotel staff; that she would be wearing provocative clothing inappropriate for the weather; that she was constantly guarded or escorted by her trafficker or his associates; that her rooms were frequently paid for with cash; and that men who were not hotel guests would often visit her room, entering and leaving at unusual times. These allegations are similar to those the Court found to be sufficient to show Hilton's participation. *See supra* Section II.B.1.b.i. And allegations of obvious signs of bruising visible to hotel staff further support that S.A.S has sufficiently alleged participation (and constructive knowledge). *A.B.*, 2023 WL 5951390, at *6 (collecting cases where courts have found that the plaintiff "adequately stated a TVPRA beneficiary claim as against a hotel" where the plaintiff "allege[d] that they exhibited some external indicator of physical distress that would have been obvious to hotel staff had they not been negligent.").[12]

Having rejected all of ESA's arguments, the Court DENIES its motion to dismiss.

### 4. *New ESA Defendants*[13]

#### i. *Statute of Limitations*

First, the New ESA Defendants join the arguments made by ESA in its separate motion to dismiss and ask the Court to grant its motion for the same reasons. Because S.A.S. alleges that all ESA defendants "jointly" owned and operated the Crossland Tacoma/Hosmer, *see* Dkt. 53 ¶¶ 13–14, the reasons for denying ESA's separate motion apply to the New ESA Defendants as

---

[12] The Court interprets ESA's briefing as conceding the "knowingly benefits" element, which it does not address.

[13] S.A.S.'s second amended complaint names ESA P Portfolio, LLC, which was named in the prior versions of the complaint and filed a separate motion to dismiss, and three new ESA defendants, which filed a separate motion to dismiss that the Court addresses here. Dkt. 69.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

well. The Court declines to dismiss the claim against the New ESA Defendants for the reasons discussed above.

The New ESA Defendants also argue that the statute of limitations has run on the claim against them because the second amended complaint was filed on March 8, 2024, which was more than ten years after S.A.S alleged she was trafficked at the Crossland hotel. *See* Dkt. 53 ¶ 45 (alleging that S.A.S. was trafficked at the Crossland hotel "[f]or a period of time, including from approximately November 16, 2013 to November 20, 2013."). While these are the only dates S.A.S. specifically identifies, she qualifies the allegation by noting these were not the only dates she was trafficked there, and also alleges that she generally "remained under the continuous control of her traffickers through at least 2016." *See id.*; *see also id.* ¶ 23.

Even assuming the addition of the New ESA Defendants in the operative complaint does not relate back to the filing of the original complaint, the motion still fails on this count. The running of a statute of limitations is an affirmative defense that the defendant bears the burden of proving. *Payan v. Aramark Mgmt. Servs. L.P.*, 495 F.3d 1119, 1122 (9th Cir. 2007). "A claim may be dismissed under Rule 12(b)(6) on the ground that it is barred by the applicable statute of limitations only when the running of the statute is apparent on the face of the complaint," meaning that "it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010) (internal quotation marks omitted). For these reasons, "[a] plaintiff is not required affirmatively to plead facts demonstrating that a claim is timely." *See Bickley v. Centurylink Communs., LLC*, No. CV 15-01014 MMM (ASx), 2015 WL 13309944, at *3 (C.D. Cal. Nov. 3, 2015).

New ESA Defendants argue that, even though S.A.S.'s complaint suggests she may have been trafficked at the Crossland after November 20, 2013 (and as late as 2016), the Court must

ORDER DENYING MOTIONS TO DISMISS - 24

assume that the last date she is able to specifically identify was the last day she was trafficked there. S.A.S. is correct that this argument is contrary to the defendant's burden to plead and prove the running of the statute of limitations. Because the complaint plausibly suggests S.A.S. was trafficked at ESA within the limitations period, the Court cannot conclude it is "apparent on [its] face" that the statute of limitations has run. This ground for the motion is denied.

ii.    *Personal Jurisdiction Over ESA INC.*

New ESA Defendants also argue that the Court does not have personal jurisdiction over ESA INC., one of the new ESA Defendants.

"In opposing a defendant's motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that jurisdiction is proper." *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1073 (9th Cir. 2011). To do so, they "need only make a prima facie showing of jurisdictional facts." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). In reviewing the motion, the court accepts "as true all uncontroverted allegations in the complaint." *Global Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1106 (9th Cir. 2020). If the defendant comes forward with a "contradictory affidavit, the plaintiff cannot simply rest on the bare allegations of its complaint." *Yamashita v. LG Chem, Ltd.*, 62 F.4th 496, 502 (9th Cir. 2023) (citation and internal quotations omitted). But if each party submits conflicting evidence, the Court "resolve[s] all genuine factual disputes in the plaintiff's favor." *See Global Commodities*, 972 F.3d at 1106. Moreover, "any evidentiary materials submitted on the motion are construed in the light most favorable to the plaintiff and all doubts are resolved in [their] favor." *Ochoa v. J.B. Martin and Sons Farms, Inc.*, 287 F.3d 1182, 1187 (9th Cir. 2002) (citation and internal quotations omitted).

"Where, as here, no federal statute authorizes personal jurisdiction, the district court applies the law of the state in which the court sits." *CollegeSource, Inc.*, 653 F.3d at 1073 (citing

Fed. R. Civ. P. 4(k)(1)(A)). "Washington's long-arm statute extends the court's personal jurisdiction to the broadest reach that the United States Constitution permits." *Microsoft Corp. v. Commc'ns & Data Sys. Consultants, Inc.*, 127 F. Supp. 3d 1107, 1113 (W.D. Wash. 2015) (citing *Byron Nelson Co. v. Orchard Mgmt. Corp.*, 95 Wash.App. 462, 975 P.2d 555 (1999)). Accordingly, "the jurisdictional analysis under state law and federal due process are the same." *Id.* (citing *Schwarzenegger*, 374 F.3d at 800–01); *see also Shute v. Carnival Cruise Lines*, 113 Wn.2d 763, 771, 783 P.2d 78 (1989).

Under federal law, personal jurisdiction over a defendant satisfies due process if they "have certain minimum contacts" with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). "[T]here are two forms that personal jurisdiction may take: general and specific." *Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015).

The Ninth Circuit applies a three-prong test to determine whether a defendant had sufficient contacts with the forum state to be subject to specific jurisdiction:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and

> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger*, 374 F.3d at 802. The plaintiff bears the burden of establishing the first two prongs. *CollegeSource, Inc.*, 653 F.3d at 1076. If they succeed, the burden shifts to the defendant

to "set forth a 'compelling case' that the exercise of jurisdiction would not be reasonable." *Id.* (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476–78 (1985)).

The first specific jurisdiction prong may be analyzed under one of two tests: purposeful availment or purposeful direction. Courts apply the purposeful direction test in cases such as this where the claim sounds in tort. *A.B.*, 2023 WL 5951390, at *4 n.5.

ESA INC. argues that "[e]ven when ESA INC. existed, it did not employ or train hotel staff, draft or implement hotel policies or procedures, or own, manage or operated the specific hotel at issue here." Dkt. 69 at 12. It attaches to its motion a declaration from ESA INC's former Vice President of Tax describing ESA INC as "the parent company of subsidiaries which owned and/or operated hotels within various states, including Washington." Dkt. 70 ¶ 5. ESA INC "did not . . . supervise, direct, or manage hotels in Washington and/or control the means and methods of how any Washington hotels conduct daily business." *Id.* ¶ 6. In response, S.A.S. submits a "final prospectus of [ESA INC.] filed with Securities and Exchange Commission in conjunction with [its] initial public offering 2013," Dkt. 81 ¶ 2, which suggests, construed in the light most favorable to S.A.S., that ESA INC. itself "own[ed] and operate[d]" its hotels, including 23 in Washington, *see id.* at 13, 78. It also states that ESA INC used a "fully integrated owner/operator model" that allowed it to "implement brand and service enhancements across our portfolio without the lengthy consultation process common to a typical franchise model," *id.* at 70, it received "room revenues," *id.* at 15, and employed "property-level employees," *id.* at 76. S.A.S.'s complaint also alleges that ESA INC, along with other ESA Defendants, "hir[ed], retain[ed], supervis[ed], and train[ed] staff at the Crossland." *See* Dkt. 53 ¶ 74.

This Court is in accord with other decisions in this circuit that have found personal jurisdiction on similar facts, even over franchisor defendants. *See J.C. v. Choice Hotels International, Inc.*, No. 20-cv-00155-WHO, 2020 WL 3035794, at *2 (N.D. Cal. June 5, 2020)

1   ("*J.C. I*") (finding franchisor hotel defendant's "argument that it [was] simply a holding

2   company" to be "unpersuasive") (citing *Team, Inc. v. Hilton Worldwide Holdings, Inc.*, No.

3   CV155057WHWCLW, 2017 WL 2539395, at *4 (D.N.J. Jun. 12, 2017)); *see also J.C. II*, 2020

4   WL 6318707, at *12 (finding first two prongs of personal jurisdiction test met because the

5   defendant "own[ed], operat[ed], and franchis[ed] hundreds of hotel properties throughout the

6   state of California, including the two Sacramento locations where she was trafficked" and the

7   plaintiff's claims arose from her trafficking at those hotels). S.A.S.'s evidence, which the Court

8   must construe in her favor, shows that ESA INC. had greater control over its hotels than the

9   average franchisor, received revenues, and hired "property-level" staff. This is sufficient to meet

10  the first two prongs of the test, and ESA INC. does not make any argument for the third prong,

11  which is its burden to prove. ESA INC.'s motion to dismiss for lack of personal jurisdiction is

12  denied.

### IV.    CONCLUSION

13

14      For the above reasons, the motions to dismiss filed by Hilton Defendants (to which HLT

15  Operate joins), Dkts. 64, 67; ESA P Portfolio, LLC, Dkt. 58, and the New ESA Defendants,

16  Dkt. 69, are DENIED.

17

18      Dated this 2nd day of July, 2024.

19

20      _____

21      Tiffany M. Cartwright
        United States District Judge

22

23

24