UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JANE DOE (S.A.S.), an individual,<br><br>Plaintiff,<br><br>v.<br><br>HILTON DOMESTIC OPERATING<br>COMPANY INC. and DOUBLETREE<br>MANAGEMENT, LLC,<br><br>Defendants. | Case No. 3:23-cv-06038-TMC<br><br>ORDER GRANTING MOTION FOR<br>SUMMARY JUDGMENT |

## I.    INTRODUCTION

Plaintiff S.A.S. alleges that she was a victim of sex trafficking at several hotels in the SeaTac, Washington area from 2002 through 2016. She sued the hotel owners and operators—Defendants ESA P Portfolio LLC, ESA Portfolio Operating Lessee, LLC, ESA Management, Inc., and Extended Stay America, Inc. (collectively, the "ESA Defendants")[1]; Hilton Domestic Operating Company Inc. ("Hilton") and Doubletree Management, LLC ("Doubletree") (collectively, the "Hilton Defendants" or "Defendants"); and HLT Operate DTWC LLC ("HLT

---

[1] On August 1, 2025, the parties filed a notice of voluntary dismissal as to the ESA Defendants. Dkt. 176. The Court thus dismissed all claims with prejudice and the ESA Defendants' motion for summary judgment, Dkt. 133, was terminated.

Operate")[2]—alleging that the hotels were liable to her as beneficiaries or perpetrators of trafficking. She brought her claims under the Trafficking Victims Protection Reauthorization Act ("TVPRA"). The only claims that remain are her claims against the Hilton Defendants.

The Hilton Defendants moved for summary judgment, arguing that undisputed evidence proves S.A.S. was not trafficked at their hotel on the dates alleged. Their evidence shows, first, that S.A.S.'s traffickers were incarcerated on the alleged dates of her trafficking at their property, the DoubleTree Seattle Airport Hotel ("DoubleTree"). Thus, they argue, it is impossible for S.A.S. to have been trafficked at their property on the claimed dates. And second, their evidence shows that S.A.S. did not stay at the DoubleTree with her traffickers on any other dates sought in discovery.

S.A.S. responded, arguing that she has offered sufficient evidence to still raise a question of material fact. Though she cannot pinpoint any other time when she may have been trafficked at Defendants' property, she contends that the trafficking must have occurred on some other date when her traffickers were not in prison. She argues that she has offered sufficient evidence that she was trafficked at the DoubleTree at some point between 2002 and 2016. Accordingly, S.A.S. requests that the Court deny the motion and allow the case to proceed to trial.

There is no serious dispute that S.A.S. was a victim of sex trafficking. Nor is it questioned that S.A.S. has difficulty recalling the timeline of what she endured because of the traumatic nature of those events. But the Court must consider here whether there is sufficient evidence that a reasonable jury could rely on to hold the Defendant hotels liable for S.A.S.'s

---

[2] HLT Operate joined the Hilton Defendant's motion and added arguments of their own. Dkt. 149. The parties subsequently stipulated to dismissing HLT Operate from the case. Dkt. 173. The Court thus dismissed all claims against HLT Operate with prejudice, and their motion was terminated. Dkt. 174.

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT - 2

trafficking under the TVPRA. And S.A.S. has not offered sufficient evidence to tie the harm she suffered to Defendants. Thus, because S.A.S. has not put forth evidence from which a reasonable jury could find in her favor, the Court GRANTS the motion for summary judgment. Dkt. 146.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

The following background facts are either undisputed or viewed in the light most favorable to S.A.S., the non-moving party. Additional material facts for each claim brought by S.A.S. are discussed in the sections corresponding to those claims.[3]

### A.    The History of S.A.S.'s Trafficking

S.A.S has testified that she was trafficked at several hotels throughout the SeaTac, Washington area from 2002 until 2016. Dkt. 144-2 at 10, 21, 43. This includes the DoubleTree Seattle Airport Hotel ("DoubleTree"), operated by the Hilton Defendants. Dkt. 151 at 24.

S.A.S.'s trafficking began in 2002. Dkt. 144-2 at 21. S.A.S. met a man named Raphael when she was "17, pregnant, and homeless." *Id.* Raphael was her boyfriend and told her that she needed to pay back money he had been spending on her. *Id.* The relationship and the trafficking lasted about six months. *Id.* at 24.

A few months after her relationship with Raphael ended, S.A.S. met Dominic Rich. *Id.* at 25. S.A.S. believed Rich was her boyfriend. *Id.* Two months after they began dating, Rich told her that he needed money to assist him with legal needs. *Id.* at 26. Having previously been trafficked, S.A.S. suggested that she could help him by engaging in commercial sex. *Id.* S.A.S.

---

[3] Many of the facts discussed in this Order come from documents which the Court allowed the parties to file under seal, primarily to protect the identity and privacy interests of S.A.S., a victim of sex trafficking. *See* Dkt. 145, 153, 158, 162, 170, 171. The Court has determined that because the facts discussed in this Order are material to the outcome of the case, the strong presumption of access to the Court's records and the public interest in understanding the judicial process outweigh any privacy interests in preventing disclosure of those material facts. Thus, while the underlying records will remain sealed, this Order will not be sealed or redacted.

"only agreed to seeing one client to get the money for him," but he began posting her on several websites. *Id.* at 27–28. She was 18 years old at the time. *Id.* at 27. Rich controlled S.A.S's commercial sex work "off and on" for the next "15 and a half years." *Id.* at 28.

Rich regularly abused S.A.S. *See, e.g.*, *id.* at 29–30. If S.A.S. was unsuccessful in booking a client, Rich would beat her. *Id.* at 29. He was abusive "[a]lmost every day." *Id.* at 30. Rich exerted extraordinary levels of control over S.A.S. *See, e.g.*, *id.* at 37–47, 47–48; Dkt. 142-6 at 30. S.A.S. only ate when Rich brought her food. Dkt. 144-2 at 47. She had to ask him for toiletries, clothing, and other basic needs. *Id.* He retained the money she made from engaging in commercial sex. *Id.* at 47, 48.

At various times, Rich still managed to control S.A.S. from prison. *Id.* at 37, 47. Sometimes while he was incarcerated she was trafficked by others, including a man named Robert Jackson. *See, e.g.*, *id.* at 38, 47; Dkt. 161-2 at 42. Other times, Rich would call her, tell her what to write in an ad, what pictures to use, what prices to put, and so on. Dkt. 144-2 at 48. She would send money that she made "to his books." *Id.* And, once released, Rich would quickly reestablish control over S.A.S. *Id.*

Rich and others trafficked S.A.S. at hotels. *Id.* at 30, 37, 54. Rich would pick the hotel and book it online. *Id.* at 30. He would list her profile on Backpage or similar websites. Dkt. 151 at 58. S.A.S. explained, "[h]e would post me. He would answer the text messages. He would tell me what to say. He would have a script written down." Dkt. 144-2 at 28–29. Sometimes the hotels were paid online and sometimes in person. *Id.* at 31.

Rich trafficked S.A.S. off and on through 2016. *Id.* at 14, 28. That August, S.A.S. managed to support law enforcement in locating and arresting Rich. *Id.* at 14. Still, S.A.S. has "struggled to free herself from Rich." Dkt. 142 at 8. She explained that when Rich would go to jail, she "would try to get a normal life," but when he was released, her "life would go back to

hell." Dkt. 144-2 at 60. S.A.S. testified that she has a "trauma bond" with Rich, and the two share a child, making it more difficult to cut off contact. *Id.* at 75, 81, 84.

On November 13, 2023, S.A.S. sued Defendants. Dkt. 1. She brought her claims against the Hilton Defendants—operators of a hotel at which she recalls being trafficked by Rich and Jackson—under the TVPRA. Dkt. 53 ¶¶ 3–4, 129–40.

S.A.S. amended her complaint shortly after. Dkt. 10. Several months later, she moved to file a second amended complaint, Dkt. 41, which the Court granted over Defendants' opposition. Dkt. 52, 53. Defendants moved to dismiss the case for failure to state a claim, Dkt. 58, Dkt. 64, which the Court denied. Dkt. 102. The parties proceeded with discovery based on the Second Amended Complaint. *See, e.g.*, Dkt. 104, Dkt. 105.

On May 19, 2025, Defendants moved for summary judgment. Dkt. 146. The motion focused primarily on S.A.S.'s lack of evidence. *See, e.g.*, Dkt. 146 at 6, 12–15. There are four key pieces to this argument: 1) Rich and Jackson were both incarcerated on the dates S.A.S. contended she was trafficked by them at the DoubleTree; 2) a manager whom S.A.S. alleges traded sex for free rooms at the DoubleTree was no longer employed on the dates provided; 3) there is no evidence to corroborate S.A.S.'s testimony that she was also trafficked at the DoubleTree on other, unknown dates; and 4) her uncorroborated testimony alone is too conclusory for a reasonable jury to find Defendants liable under the TVPRA. *See, e.g.*, Dkt. 146 at 6. Consequently, the history of discovery and the facts produced are necessary here. The Court recounts the testimony produced in written discovery, depositions, and supplemental affidavits.

**B.    S.A.S.'s Trafficking at the DoubleTree Hotel Seattle Airport**

S.A.S.'s claims against the Hilton Defendants concern trafficking at the Seattle Airport DoubleTree in Seattle, Washington. Dkt. 161-2 at 10, 77; Dkt. 53 ¶¶ 92–128. In her complaint, S.A.S. alleged that she was repeatedly trafficked for sex at the DoubleTree for "a period of time

that included approximately November 29, 2013 to November 30, 2013." Dkt. 53 ¶ 92. The complaint notes that "S.A.S.'s trafficking at the Doubletree Hotels Seattle Airport was not limited to the dates listed, but those are the only specific dates she is currently able to identify. Upon information and belief, Defendants' records will reveal additional dates that S.A.S. was at this hotel." *Id.*

Accordingly, fact discovery proceeded by focusing on the November 2013 dates and seeking evidence identifying additional nights S.A.S. was trafficked at the DoubleTree. *See* Dkt. 146 at 6.

### 1.    *Written Discovery*

In their interrogatory requests, Defendants asked S.A.S. to "[i]dentify the trafficker and associates who were responsible for Plaintiff's alleged trafficking at the DoubleTree . . ., including the circumstances of how Plaintiff came to be trafficked by the trafficker . . ., [and] whether the trafficker was physically present at the DoubleTree . . . at the time of the alleged trafficking[.]" Dkt. 151 at 57–58. S.A.S. identified two individuals who trafficked her at the DoubleTree Hotel Seattle Airport: Dominic Rich and Robert Jackson. *Id.* at 57–58, 62. She responded that both Jackson and Rich trafficked her on different occasions at the hotel and that Rich trafficked her on the November 2013 dates. *Id.* at 58, 62.

She added that a manager at the DoubleTree forced her to have sex with him in exchange for rooms. *Id.* at 58. She explained that the manager would refuse to let her "pay cash for the room because he wanted sex in exchange." *Id.* When rooms were not traded for sex, they were booked using a "prepaid Vanilla or Greendot card, or cash." *Id.* at 59. Rooms were rented in her name, or in the names of Rich or one other individual. *Id.*

The Hilton Defendants similarly asked S.A.S. to "[i]dentify and describe all facts, including all documents or physical evidence, which refer or relate to the trafficker who was

responsible for Plaintiff's alleged trafficking at the DoubleTree Hotel Seattle Airport." *Id.* at 62.

She responded, "Dominic Rich and Robert Jackson were both responsible for trafficking me at

the Doubletree hotel on different occasions. Dominic Rich trafficked me here in November of

2013." *Id.*

S.A.S. produced a booking receipt for a stay at the DoubleTree from November 29–30,

2013. *Id.* at 59. She explained, however, that those "were not the only dates that [she] was at this

hotel location." *Id.* That said, she noted that Rich was the one who trafficked her at the

DoubleTree in November 2013. *Id.* at 62.

She recalled several details from her time at the DoubleTree:

> Housekeeping would have seen lots of unused condoms, multiple used condoms
> and wrappers, stripper/platform high heels, skimpy and provocative mini dresses.
> There was always overuse of towels and linens. Dominic would use the hotel
> computers to upload provocative photos of me and post ads on Backpage. I was
> always having to go to the front door to get johns. I remember being on the first
> floor, not too far from the hotel desk, often times waiting on the johns. There was
> always heavy traffic to and from the room. I would get in trouble by my trafficker
> if I had to go find the john after not giving him the correct description of where to
> find my room. I remember having to see at least seven johns from November 29-
> 30. I was forced to have sex with the manager/employee so it was obvious as to
> what was happening at this location.

*Id.* at 63.

S.A.S. also stated that her counsel was "in possession of hotel booking

receipts/confirmations, Backpage ads, police reports, medical and billing records, photos and

screenshots of photos, articles about [her] trafficker and the victim impact statement that [she]

wrote when Dominic Rich was finally arrested." *Id.* at 61–62. The only records of hotel

reservations S.A.S. produced were for November 2013. *Id.* at 77–78. The current manager of the

DoubleTree submitted a declaration attesting that, other than the November 2013 date, there is

no record of S.A.S., her traffickers, or their known aliases in the DoubleTree's reservation

system between January 1, 2013 and August 19, 2016. Dkt. 152.

1

2.      *Deposition Testimony*

2           During her deposition, S.A.S. testified that she was trafficked at the DoubleTree for a

3    "month or two in total[,]" somewhere between thirty and sixty nights from 2002 to 2016.

4    Dkt. 161-2 at 72. She testified that she searched her email and other records for reservations and

5    produced what she could find. *Id.* Those records said that she had stayed at the DoubleTree on

6    November 29, 2013, checking out on November 30. Dkt. 151 at 77.

7           S.A.S.'s deposition testimony about the November 29, 2013 stay was somewhat

8    inconsistent. At one point, S.A.S. testified that she did not have a "specific recollection" of

9    staying at the DoubleTree on November 29, 2013. Dkt. 161-2 at 72–73. She could not recall any

10   interactions with workers that day, nor what room she stayed in. *Id.* at 73–74. At another point,

11   however, S.A.S. testified that while she did not specifically remember staying at the DoubleTree

12   on that date, she knew Rich was her trafficker during that visit and that he used the computers at

13   the hotel to advertise her. Dkt. 151-1 at 22. She testified that Rich had used her email address to

14   make the reservation on Hotwire. *Id.* at 24.

15          S.A.S.'s testimony about the overall timeline of her trafficking at the DoubleTree was

16   also inconsistent. S.A.S. testified that there was a manager at the DoubleTree who traded sex

17   with her for free rooms. Dkt. 161-2 at 83. He told her he was a manager at the hotel and that he

18   wanted to see her and be a regular. *Id.* at 84. She estimated they engaged in commercial sex at

19   least thirty times, and that Rich was aware of and approved this arrangement. *Id.* at 85–86. She

20   could not remember the year when first asked, but then testified that their interaction began after

21   November 29, 2013. *Id.* S.A.S. testified that she only stayed at the DoubleTree "a couple times

22   without the manager being there," *id.* at 86, and she agreed that November 2013 was "one of the

23   first times" she stayed at the DoubleTree and "everything else happened thereafter," *id.* at 87.

24

She said that the last time she stayed at the DoubleTree was when she refused to have sex with the manager. Dkt. 151-1 at 37.

Later in the deposition, however, S.A.S. estimated that Jackson trafficked her around 2011 and 2012, while Rich was incarcerated. Dkt. 161-2 at 106. And she explained that Jackson would "put [her] at the DoubleTree" during that time. *Id.* at 109. S.A.S. never equivocated on who trafficked her at the DoubleTree, repeatedly clarifying that Rich and Jackson "both were my traffickers at the DoubleTree[.]" *See id.* at 108.

When asked what the manager who traded sex for rooms looked like, S.A.S. described him as "African," "five ten or five eleven," with "short hair" and an "athletic buil[d]," likely in his 30s or 40s. *Id.* During the deposition, counsel for the Hilton Defendants showed S.A.S. several photographs of men who fit that description—one of whom had worked at the DoubleTree. *See* Dkt. 151 at 101–02. They obtained the photographs from the individual's Facebook profile. *Id.* at 102. S.A.S. identified the man who had worked at the DoubleTree as the manager who had exchanged rooms for sex. *Id.* at 91, 102.

### 3. *Hilton's Key Evidence on Summary Judgment*

The Hilton Defendants moved for summary judgment, Dkt. 146, based primarily on the following evidence: Dominic Rich was incarcerated from October 5, 2010 through May 13, 2014, and Robert Jackson was incarcerated from November 1, 2011 through August 10, 2015. Dkt. 134 at 56; Dkt. 148 at 16–25; *infra* Section IV.A.1. Further, Hilton's search of its reservation system had not found any record of stays by S.A.S. or her traffickers from January 1, 2013 through August 2016, other than the November 29, 2013 stay identified by S.A.S. Dkt. 152 ¶¶ 3–7. And the Hilton employee identified by S.A.S. as the manager who traded rooms for sex had been fired in May 2012. Dkt. 152 ¶¶ 8–10; Dkt. 151-11. Therefore, Defendants argued, S.A.S. could not have been trafficked at their hotel by Rich or Jackson on the only specific dates

alleged in 2013, nor could the manager she identified have been complicit in her trafficking by exchanging rooms for sex in that timeframe.

### 4.    Post-Deposition Affidavit

In opposing Defendants' motion for summary judgment, S.A.S. submitted a declaration that sought to clarify her deposition testimony. Dkt. 161-1. In the declaration, she wrote: "While I cannot identify specific dates when I was trafficked at the Seattle Airport DoubleTree, I am certain this is a hotel where I was trafficked on multiple occasions." Dkt. 161-1 ¶ 4. With respect to the manager who exchanged rooms for sex, S.A.S. stated: "I do not remember the timeframe during which this man was one of my regular tricks at the Seattle Airport Double Tree, but I know he called me back to this hotel many times until one occasion when I refused to have sex with him. This man would see my traffickers leaving as he entered my hotel room and would interact with my traffickers at the front desk." *Id*. ¶ 5. S.A.S. repeated many of the details she had previously testified to about what occurred when Rich trafficked her: he used lobby computers to post ads for her, interacted with hotel staff, prevented her from leaving the room unaccompanied, injected her with drugs, and physically abused her in ways that could be seen and heard by hotel staff. *See id.* ¶ 7. She also noted similar recollections about Jackson's presence and actions at the DoubleTree. *Id.* ¶ 8. But she acknowledged she could not remember any dates on which these things happened. *Id.* ¶¶ 3–4.

To explain the lack of specificity, S.A.S. states in her affidavit:

Although I had repeatedly stated that I did not remember the dates when I was trafficked at the Seattle Airport Doubletree, at one point I tried to provide a timeline. The timeline that I gave was not based on my own memory of the dates when things happened. Instead, I said that my trafficking at the Seattle Airport DoubleTree must have occurred after the date that the lawyers kept asking me about.

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT - 10

1   *Id.* ¶ 11. She notes that she had also testified that Jackson likely trafficked her at this hotel before

2   he was arrested in 2011 or 2012. *Id.* ¶ 14. She does not narrow the potential date further. *See id.*

3   And she offers no potential date range for her trafficking by Rich at the DoubleTree. *See id.*

4   Finally, S.A.S. stated that she does "not specifically recall whether or why I was at the Seattle

5   Airport Double Tree on November 29, 2013." *Id.* ¶ 15.

6       Defendants replied. Dkt. 163. The motion for summary judgment, Dkt. 146, has been

7   fully briefed. The Court held oral argument on July 28, 2025 and heard from both parties.

8   Dkt. 171; Dkt. 175. The motion is ripe for the Court's consideration.

### III.    LEGAL STANDARD

**A.    Summary Judgment**

11      "The court shall grant summary judgment if the movant shows that there is no genuine

12  dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

13  Civ. P. 56(a). A dispute as to a material fact is genuine "if the evidence is such that a reasonable

14  jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281

15  F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

16  (1986)). The moving party has the initial burden of "'showing'—that is, pointing out to the

17  district court—that there is an absence of evidence to support the nonmoving party's case."

18  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party meets its initial burden,

19  the nonmoving party must go beyond the pleadings and "set forth specific facts showing that

20  there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. The moving party is entitled to

21  judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an

22  essential element of a claim in the case on which the nonmoving party has the burden of proof.

23  *Celotex*, 477 U.S. at 323.

24

1

2

Generally, "'[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam) (quoting *Anderson*, 477 U.S. at 255). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. Thus, at summary judgment, the court must resolve "factual issues of controversy in favor of the non-moving party[.]" *Lujan,* 497 U.S. at 888 (internal quotations omitted). But conclusory, nonspecific statements in affidavits are not sufficient, and "missing facts" will not be presumed. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990).

## B. Trafficking Victims Protection Reauthorization Act (TVPRA)

"In 2000, Congress enacted the [Trafficking Victims Protection Act] to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims." *Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159, 1164 (9th Cir. 2022) (internal quotation marks omitted). Congress "reauthorized and amended" the statute in 2003 and added a civil remedy provision, which provided for civil liability for those who perpetrated or participated in an underlying violation of the statute's criminal provisions. *See* Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193, § 4(a)(4)(A), 117 Stat. 2875 (2003). Congress again reauthorized and amended the TVPRA in 2008 "to expand the civil remedies provision." *Ratha*, 35 F.4th at 1164. Under that provision:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595. Relevant here, the TVPRA sets out criminal liability for:

(a) Whoever knowingly—

(1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or

(2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),

knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

18 U.S.C. § 1591. The civil provision of the statute thus creates liability for both those who

perpetrate trafficking themselves ("perpetrator liability") and those who "knowingly benefit[],

financially or by receiving anything of value from participation in a venture which that person

knew or should have known has engaged in an act in violation of" the TVPRA ("beneficiary

liability"). 18 U.S.C. § 1595(a).

## IV.    DISCUSSION

**A.    Rulings on Evidence and Argument Before the Court**

### 1.    *Judicial Notice of Rich and Jackson's Incarceration*

A court may take judicial notice of facts "not subject to reasonable dispute" because they

are either: "(1) [ ] generally known within the trial court's territorial jurisdiction; or (2) can be

accurately and readily determined from sources whose accuracy cannot reasonably be

questioned." Fed. R. Evid. 201. This includes "information [that] was made publicly available by

government entities" where "neither party disputes the authenticity . . . or the accuracy of the

information." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010). And a

court may take notice of "documents on file in federal or state courts." *Harris v. Cnty. of*

*Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012). The Court may take judicial notice sua sponte or upon the request of a party. Fed. R. Evid. 201(c).

Courts in this circuit have applied these principles to take judicial notice of an individual's incarceration. *See, e.g.*, *U.S. v. Basher*, 629 F.3d 1161, 1165 (9th Cir. 2011) (taking judicial notice of public information on the Bureau of Prisons inmate locator website); *Foley v. Martz*, No. 3:18-cv-02001-CAB-AGS, 2018 WL 5111998, at *1 n.1. (S.D. Cal. Oct. 19, 2018) (taking judicial notice of information on California Dept. of Corrections and Rehabilitation inmate locator website); *Benton v. El Dorado Cnty. Sheriff's Dep't*, No. 2:15-CV-0772 AC P, 2018 WL 4444605, at *1 n.2 (E.D. Cal. Sept. 18, 2018) ("[R]eview of the inmate-locator websites operated by the California Department of Corrections and Rehabilitation (CDCR) and the EDCJ indicate that plaintiff is not incarcerated under the authority of either.").

S.A.S. does not dispute the dates of Rich's incarceration or the records from this period. The dates of his incarceration are facts subject to judicial notice. They are "matters of public record whose authenticity is not disputed." *Hammler v. Lyons*, No. 119CV01650AWIGSAPC, 2023 WL 395898, at *3 (E.D. Cal. Jan. 25, 2023), *report and recommendation adopted*, No. 119CV01650AWIGSAPC, 2023 WL 2839470 (E.D. Cal. Apr. 7, 2023). Accordingly, the Court notes that Rich was incarcerated from October 5, 2010 through May 13, 2014. Dkt. 134 at 56.

The Court also takes judicial notice of the dates of Jackson's incarceration. Jackson was incarcerated from November 1, 2011 through August 10, 2015. Dkt. 148 at 16–25.

### 2.    Consideration of S.A.S.'s Declaration

Defendants also argue that the Court should not consider the declaration offered by S.A.S. in opposition to their summary judgment motion. Dkt. 163 at 6–8 (discussing Dkt. 161-1). Defendants contend that the declaration directly contradicts S.A.S.'s previous sworn testimony and should be stricken under the "sham affidavit" rule. *Id.*

In Defendants' telling, having realized "that her sworn testimony denies the truth, [S.A.S.] and her attorneys have shifted to a new version of events." Dkt. 163 at 6. They argue that S.A.S.'s "refusal to give new dates" for when she was trafficked at their hotel or "an alternative timeline obfuscates rather than clarifies matters, and, if anything, only creates further contradictions with her testimony." *Id.* at 7 (citation modified). They claim that the declaration either directly contradicts her sworn testimony or offers new facts, such as an interaction with another hotel employee. *Id.* at 7–8. S.A.S. responds that her declaration explains honest confusion in her earlier testimony and is not directly inconsistent. Dkt. 159 at 19.

"The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) (citing cases). This sham affidavit rule prevents "a party who has been examined at length on deposition" from "rais[ing] an issue of fact simply by submitting an affidavit contradicting his own prior testimony," which "would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Id.* (citations omitted). But the sham affidavit rule "should be applied with caution because it is in tension with the principle that the court is not to make credibility determinations when granting or denying summary judgment." *Id.* (citation omitted). To trigger the sham affidavit rule, a "district court must make a factual determination that the contradiction is a sham, and the 'inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit.'" *Id.* (citation modified).

Some portions of S.A.S.'s declaration are consistent with her deposition testimony: that she estimates she was trafficked at the DoubleTree for a total of 30–60 days over 15 years; that she struggles to remember the timeline of events; that a DoubleTree manager insisted on trading

rental of hotel rooms for sex; and that she remembers both Rich and Jackson being present and trafficking here there. *See id.* ¶¶ 3–8.

But other, material portions of her declaration do contradict her prior sworn interrogatory answers and deposition testimony. At her deposition, S.A.S. testified that Rich must have been with her when she was at the DoubleTree in November 2013, and that she remembered him using the hotel's computers during the visit. Dkt. 151-1 at 22–23. She testified that Rich made the hotel reservation using her email address. *Id.* at 24. She testified that trading commercial sex with the manager for free rooms occurred after November 2013, that she only stayed at the DoubleTree a couple times when the manager wasn't there, and that the last time she stayed at the DoubleTree was after refusing sex with the manager. *Id.* at 34–37. Similarly, in her interrogatory answers, S.A.S. stated repeatedly and unequivocally that Rich had trafficked her at the DoubleTree in November 2013. *See supra* Section II.B.1. Only after Hilton put forward its summary judgment evidence establishing the impossibility of this timeline did S.A.S. submit her new declaration, stating that she could not remember any specific dates that she was trafficked at the hotel; that she was not sure whether or why she stayed at the DoubleTree in November 2013, that she could not give any timeline for when the hotel's manager traded rooms for sex; and that the timeline offered in her deposition had been a mistaken belief based on the lawyer's questions. *See* Dkt. 161-1 ¶¶ 3–6, 11–13, 15.

This change in S.A.S.'s testimony following disclosure of Defendants' summary judgment evidence is what the sham affidavit rule is designed to prevent. And there are clear, unambiguous inconsistencies between S.A.S.'s sworn deposition testimony and interrogatory answers and her later declaration. But striking S.A.S's declaration is ultimately unnecessary because the changes in her testimony do not help her case. S.A.S. essentially admits in her declaration that there is no longer evidence that ties her trafficking to the November 29, 2013

1    date—the only specific date for which there was any evidence of S.A.S.'s presence at the

2    DoubleTree hotel. Without that connection, she instead rests her summary judgment opposition

3    on her testimony that, while she cannot provide any date range, she is certain that she was

4    trafficked at the DoubleTree by Rich and Jackson, and that the DoubleTree manager was

5    complicit in her trafficking by trading rooms for sex, at some point before Rich and Jackson

6    were incarcerated.

7        The Ninth Circuit has recognized that "declarations are often self-serving, and this is

8    properly so because the party submitting it would use the declaration to support his or her

9    position." *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015) (citing *S.E.C. v.*

10   *Phan*, 500 F.3d 895, 909 (9th Cir. 2007)). "Although the source of the evidence may have some

11   bearing on its credibility and on the weight it may be given by a trier of fact, the district court

12   may not disregard a piece of evidence at the summary judgment stage solely based on its self-

13   serving nature." *Id.* (citing *Phan*, 500 F.3d at 909). Still, "a self-serving declaration does not

14   always create a genuine issue of material fact for summary judgment: The district court can

15   disregard a self-serving declaration that states only conclusions and not facts that would be

16   admissible evidence." *Id.* (citing cases).

17       Many of the statements in S.A.S.'s declaration are little more than conclusions. For

18   example, she states, "[w]hile I cannot identify specific dates when I was trafficked at the Seattle

19   Airport DoubleTree, I am certain this is a hotel where I was trafficked on multiple occasions."

20   Dkt. 161-1 ¶ 4. And again, she explains, "[w]hile I do not know the dates of my trafficking at the

21   Seattle Airport DoubleTree and I cannot independently recall a timeline, I can say that my

22   trafficking at the Seattle Airport DoubleTree must have included times before November 2013."

23   *Id.* ¶ 14. While S.A.S. describes facts surrounding how Rich and Jackson behaved when they

24   trafficked her, the only evidence connecting their trafficking to Defendants is S.A.S.'s

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT - 17

conclusory, "uncorroborated[,] and self serving" testimony. *Villiarimo*, 281 F.3d at 1061
(citations omitted). While the Court does not question S.A.S.'s testimony that the ongoing
trauma from her trafficking makes it difficult to remember the timeline of events, the question on
summary judgment is whether there is sufficient evidence in the record for a reasonable jury to
find Defendants liable on the elements of a TVPRA claim. As explained further below, *see infra*
Section IV.B, even considering her declaration, S.A.S. has not met that burden.

### 3.    Claims Raised at Oral Argument

At oral argument, S.A.S.'s counsel attempted to raise a new argument—that it was not
Rich or Jackson, but instead a man named Napoleon "Drop" Matthews who trafficked S.A.S. at
the DoubleTree in November 2013. *See* Dkt. 175. Arguments raised for the first time at oral
argument are generally considered waived. *See In re Pac. Pictures Corp.*, 679 F.3d 1121, 1130
(9th Cir. 2012) ("We generally do not consider issues raised for the first time during oral
argument, unless failure to do so would result in manifest injustice and the appellee would not be
prejudiced by such consideration.") (citation modified); *see also James v. Ryan*, 679 F.3d 780,
804 (9th Cir. 2012), *cert. granted, judgment vacated on other grounds*, 568 U.S. 1224, (2013)
("When a party raises a distinct argument for the first time at oral argument before us, not having
briefed it at all, we normally consider that argument waived."). Accordingly, the Court will not
consider this new argument, but notes that S.A.S unequivocally testified on several occasions
that her only traffickers at the DoubleTree were Rich and Jackson. *See, e.g.*, Dkt. 161-2 at 42–45,
108–109.

### B.    TVPRA Claims Against the Hilton Defendants

The Hilton Defendants contend that, even if S.A.S.'s affidavit is considered, they are
entitled to summary judgment on the merits of her TVPRA claims. Defendants principally argue
that S.A.S.'s "version of the facts is entirely contradicted by record evidence." Dkt. 146 at 6.

They note that the "men who supposedly trafficked her on the hotel premises were imprisoned"; "the manager who she accuses of giving her free rooms in exchange for sex (at no benefit to Hilton) was not employed"; and she has failed to produce any additional hotel room records to identify other stays at the DoubleTree. *Id.* Thus, they conclude, "no reasonable juror could possibly find Hilton liable." *Id.*

S.A.S. responds that, while "S.A.S. vividly remembers the trauma she endured at the hotel, she struggles— years later—to recall specific dates or place events in a clear timeline." Dkt. 159 at 2. S.A.S. argues that it is not the place of the Court to "discredit S.A.S.'s testimony based on her confusion about dates and timeline." *Id.* Rather, a "jury could credit the substance of her testimony despite S.A.S.'s difficulty recalling dates, especially given the passage of time, the chaotic and traumatic circumstances of her trafficking, and the psychological harm she suffered." *Id.* (citation omitted).

S.A.S. ventures two theories of liability under the TVPRA: beneficiary liability and perpetrator liability. Dkt. 159 at 9, 15. The Court takes the elements of each in turn.

### 1. Beneficiary Liability

To succeed on a beneficiary liability theory under § 1595(a), the plaintiff must show that the defendant "(1) knowingly benefitted, (2) from participation in a venture . . . , (3) which they knew or should have known was engaged in conduct that violated the TVPRA." *Ratha*, 35 F.4th at 1175 (citing 18 U.S.C. § 1595(a)).[4] Proving each element is required. *See id.*

---

[4] In *G.G. v. Salesforce.com, Inc.*, the Seventh Circuit "reorganized the most common summaries of these elements to follow a logical sequence rather than the sequence of the phrases in Section 1595": "a plaintiff . . . who is a victim of a criminal violation must allege and ultimately prove that (1) a venture has engaged in an act in violation of Section 1591, (2) the defendant knew or should have known that the venture had violated Section 1591, (3) the defendant participated in that venture, and (4) the defendant knowingly benefited from its participation." 76 F.4th 544, 553 n.5 (7th Cir. 2023).

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT - 19

The Hilton Defendants assert that S.A.S. cannot satisfy the elements of her beneficiary liability claim because she cannot prove that Hilton engaged in any transactions with her traffickers, nor that the Hilton Defendants "knew or should have known" that she was being trafficked at their hotel. Dkt. 146 at 21. They argue that "the trafficker's absence during the relevant timeframe means that Hilton could not have established a 'pattern of conduct' or formed a 'tacit agreement' with him" from which Defendants could benefit. *Id.* at 22. And, they point out, the man who S.A.S. claims traded sex for rooms was fired in 2012—a period for which S.A.S. cannot offer evidence of any stays at the DoubleTree. *See id.* Defendants rely on the evidence they have offered to show that S.A.S. did not stay at the hotel on any other dates for which records were sought during discovery, while pointing out that S.A.S. has failed to produce any evidence of stays on her own. *See id.* at 21–23.

The Court agrees with Defendants that, even viewing the evidence in the light most favorable to S.A.S., her beneficiary liability claim must be dismissed because she cannot prove that Defendants participated in a venture with her traffickers. When the Court denied Defendants' motion to dismiss, it found that S.A.S. had met this element by plausibly alleging a continuous business relationship between her traffickers and the Hilton Defendants. *(S.A.S.) v. ESA P Portfolio LLC*, No. 3:23-CV-06038-TMC, 2024 WL 3276417, at *6–7 (W.D. Wash. July 2, 2024). But S.A.S. has not met her burden to produce evidence sufficient to sustain that theory at the summary judgment stage.

As the Court explained in its order on Defendants' motion to dismiss, courts have recognized multiple ways to establish the "participation in a venture" requirement. *See id.* at *6 (citing cases). One method is by establishing a "direct and continuous relationship that existed between the parties." *Doe 1 v. Apple Inc.*, 96 F.4th 403, 416 (D.C. Cir. 2024) (citing *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 560 (7th Cir. 2023)). Where a defendant hotel "provides

assistance, support, or facilitation to the trafficker through such a 'continuous business relationship,' a court or jury may infer that the participant and trafficker have a 'tacit agreement' that is sufficient for 'participation' under Section 1595." *G.G.*, 76 F.4th at 559 (quoting *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 970 (S.D. Ohio 2019) (plaintiff must show "a continuous business relationship between the trafficker and the hotels such that it would appear that the trafficker and the hotels have established a pattern of conduct or could be said to have a tacit agreement")).

At the Rule 12(b)(6) stage, where the Court was required to presume the truth of S.A.S.'s allegations, the Court found her complaint plausibly alleged this element against the Hilton Defendants. *Doe (S.A.S.)*, 2024 WL 3276417, at *6–7. S.A.S. alleged that she had been trafficked at the DoubleTree on dates that included but were not limited to November 2013; that Hilton's records would reveal additional dates; that her trafficker maintained a relationship with the hotel's staff, including the manager who traded rooms for sex; that Hilton continued to rent rooms to and maintain a relationship with her trafficker even after observing obvious signs of trafficking; and that hotel staffers had made a report to Hilton about the signs of trafficking. *See id.* at *2 (citing Dkt. 53). The Court explained that this "plausibly connected the dots" between Defendants and S.A.S.'s trafficking, as it alleged that hotel staff continued to provide rooms and maintain a relationship with S.A.S's trafficker even after observing obvious "red flags" of her trafficking that its policies required reporting up the corporate chain of command. *Id.* at *7.

But S.A.S. has not been able to sustain these allegations with evidence sufficient to survive summary judgment. "A moving party without the ultimate burden of persuasion at trial— usually, but not always, a defendant—has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000) (citation omitted). To carry its

1  burden of production, the movant "must either produce evidence negating an essential element of

2  the nonmoving party's claim or defense or show that the nonmoving party does not have enough

3  evidence of an essential element to carry its ultimate burden of persuasion at trial." *Id.* (citation

4  omitted). If a moving party "carries its burden of production, the nonmoving party must produce

5  evidence to support its claim or defense." *Id.* at 1103 (citing cases). And S.A.S. has not done so.

6  Here, Defendants met their initial burden by producing evidence that the two men who

7  allegedly trafficked S.A.S. at the DoubleTree were incarcerated in November 2013, the only

8  specific dates alleged; that the DoubleTree's reservation system did not contain records of

9  additional stays; and that the hotel manager identified by S.A.S. as being complicit in her

10  trafficking had been fired by 2012. In addition to the prison records subject to judicial notice,

11  Defendants offered testimony from Jon McFarland, General Manager at the DoubleTree Seattle

12  Airport. Dkt. 152 ¶ 2. McFarland conducted a reservation system review reaching back to

13  January 1, 2013 through August 19, 2016. *Id.* ¶ 4–5. He searched both for S.A.S.'s name, as well

14  as several other names provided in connection with the suit. *Id.* ¶ 5. He also searched for

15  addresses related to the individuals. *Id.* The results showed only the online booking made by

16  S.A.S. for November 29 and 30, 2013. *Id.* ¶ 6. There were no other reservation records for her or

17  her aliases or addresses. *Id.* The same was true for Rich. *Id.* Though there were reservations for

18  the name Robert Jackson, there "is no indication that these reservations are associated with the

19  Robert Jackson identified in" the complaint. *Id.* ¶ 7. The available address information for each

20  of the individuals is different and none "align with any known information for [S.A.S.] or the

21  Robert Jackson in question." *Id.*

22  Additionally, the records show that the Hilton employee/manager identified by S.A.S. in

23  her deposition was fired from the DoubleTree in May 2012. *Id.* ¶ 9. To the best of McFarland's

24

knowledge, "there were no other front desk managers of African descent at the DoubleTree Seattle Airport between 2013 and 2016." *Id.* ¶ 10.

In response, S.A.S. argues that her traffickers "brought her back to this hotel repeatedly, resulting in her being trafficked there for a total of between 30 and 60 non-consecutive days." Dkt. 159 at 10. S.A.S. maintains that her testimony about the open signs of trafficking that occurred on those visits is enough to establish a continuous business relationship. *See id.*; *see also* Dkt. 161-1 ¶¶ 4–8.

But even if the Court declines to strike S.A.S.'s declaration as a sham affidavit, her testimony that she was trafficked at the DoubleTree by two different men for a total of 30 to 60 non-consecutive days between 2002 and 2016 is simply not enough for a reasonable jury to find a *continuous* business relationship. The courts applying that test—including this Court when denying Defendants' motion to dismiss—have focused on allegations or evidence of an ongoing pattern of activity between the civil defendant and the trafficker that is sufficient to infer the defendant knew or should have known they were facilitating the specific trafficker's venture. *See G.G.*, 76 F.4th at 561 ("'Participation' does not require getting yours hands dirty. It is enough that plaintiffs allege that Salesforce facilitated the success of Backpage's sex-trafficking venture *as a whole*.") But without any evidence of S.A.S. being trafficked for even two consecutive nights—or even two nights in close proximity to each other—across fifteen years, a reasonable jury could not infer "a continuous business relationship between the trafficker and the hotels such that it would appear that the trafficker and the hotels have established a pattern of conduct or could be said to have a tacit agreement." *M.A.*, 425 F. Supp. 3d at 970. Because S.A.S. cannot establish that the Hilton Defendants participated in her traffickers' venture, her beneficiary liability claim must be dismissed.

1

2.     *Perpetrator Liability*

S.A.S. also alleges that Defendants violated the TVPRA on a "perpetrator liability"

theory. "Civil perpetrator liability under § 1595 adopts § [1591]'s elements for criminal

liability." *B.J. v. G6 Hosp., LLC*, No. 22-cv-03765-MMC, 2023 WL 6120682, at *11 (N.D. Cal.

Sept. 18, 2023) (internal quotation marks omitted). "To prove a criminal violation of Section

1591, the government must prove that the defendant, with the requisite state of mind, either

(1) engaged in one of the listed acts of sex trafficking or (2) benefitted from participating in a

venture that engaged in one of those acts." *G.G.*, 76 F.4th at 552. To prove beneficiary liability

under the criminal provision, § 1591(a)(2), the perpetrator must have "knowingly assist[ed],

support[ed], or facilitat[ed]" whoever "recruit[ed] . . . , harbor[ed], or maintain[ed]" the victim.

§ 1591(e)(4).

As for the criminal provision's knowledge requirement, "[w]hat the statute requires is

that the defendant kn[ew] in the sense of being aware of an established modus operandi that will

in the future cause a person to engage in prostitution." *J.M. v. Choice Hotels Int'l, Inc.*, No. 2:22-

cv-00672-KJM-JDP, 2023 WL 3456619, at *2 (E.D. Cal. May 15, 2023) (quoting *United States

v. Todd*, 627 F.3d 329, 334 (9th Cir. 2010)).

S.A.S.'s perpetrator liability claim fails for the same fundamental reason as her

beneficiary liability claim. At the Rule 12(b)(6) stage, the Court found that this claim survived

because S.A.S. had plausibly alleged that Hilton knowingly facilitated or assisted the trafficking

operation by maintaining a relationship with her trafficker despite staff observing and reporting

obvious signs of her trafficking. *Doe (S.A.S.)*, 2024 WL 3276417, at *10. But the only evidence

remaining at summary judgment—that S.A.S. was trafficked at the DoubleTree for a total of 30

to 60 unknown, non-consecutive nights by two different men across fifteen years—is not

sufficient for a reasonable jury to find that the Hilton Defendants knowingly assisted, supported, or facilitated her traffickers.

## C.          Statute of Limitations

The parties also raise arguments regarding the statute of limitations on S.A.S.'s claims. The closest S.A.S. comes now to identifying specific dates on which she was trafficked is her testimony that she was likely trafficked at the DoubleTree by Robert Jackson sometime in 2011 or 2012. Dkt. 161-1 ¶ 14 ("I specifically recall that Robert Jackson trafficked me at this hotel and the period when he trafficked me was before he and Michelle Liggett were arrested in front of my apartment complex in 2011 or 2012."). As Defendants point out, Jackson was incarcerated beginning in November 2011, and Rich was incarcerated beginning in October 2010, so any trafficking by those two men before November 2013 must have occurred before those dates. *See* Dkt. 163 at 9. But S.A.S. did not file her complaint until November 2023, and the TVPRA has a ten-year statute of limitations. 18 U.S.C. § 1595(c)(1). Thus, Defendants argue, any claims based on trafficking before November 2013 are also time-barred. Dkt. 163 at 9. S.A.S. responds that application of the discovery rule or equitable tolling would save these claims. Dkt. 159 at 20–21. Because S.A.S.'s claims are dismissed on the merits, the Court does not reach these arguments.

## V.          CONCLUSION

For these reasons, the motion for summary judgment, Dkt. 146, is GRANTED, and S.A.S.'s claims are DISMISSED with prejudice. The Court will enter judgment and the Clerk is directed to CLOSE the case.

Dated this 11th day of August, 2025.

Tiffany M. Cartwright
United States District Judge